IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES W. AREHART,<br><br>*Defendant*. | Case No. 3:23CR 154<br><br>18 U.S.C. §§ 1341 and 2<br>Mail Fraud<br>(Counts 1-2)<br><br>18 U.S.C. §§ 1343 and 2<br>Wire Fraud<br>(Counts 3-4)<br><br>18 U.S.C. § 1957<br>Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity<br>(Counts 5-6)<br><br>18 U.S.C. § 1001<br>False Statement<br>(Count 7)<br><br>Forfeiture Allegation |

FILED NOV 15 2023 CLERK, U.S. DISTRICT COURT RICHMOND, VA

## INDICTMENT

November 2023 Term—At Richmond, Virginia

THE GRAND JURY CHARGES THAT:

### Introductory Allegations

At all times relevant to this Indictment, unless otherwise stated:

1. Beginning in or around April of 2018, through at least in or around December of 2021, the defendant, JAMES W. AREHART ("AREHART"), was the founder, Chief Executive Officer (CEO), Chief Financial Officer (CFO), and sole board member of a charity named Providing Hope VA ("PHVA"). AREHART incorporated PHVA as a non-profit corporation in

the State of South Carolina on or about April 30, 2018.

2. PHVA's professed mission was raising funds, primarily by way of advertising and conducting online raffles for high-end motor vehicles, to provide housing and other assistance to homeless or otherwise destitute veterans of the United States Armed Forces.

3. AREHART was a resident of the Commonwealth of Virginia and residing in Fredericksburg at the time that he incorporated PHVA. AREHART utilized a Fredericksburg address as PHVA's mailing and physical address.

4. AREHART would operate PVHA from that Fredericksburg-area office location from PHVA's inception until in or around early 2020, when AREHART re-located the charity's operations to Loris, South Carolina.

5. AREHART opened a bank account in the name of PHVA (the "PHVA Bank Account") on or about May 3, 2018, at a Stafford, Virginia branch of Wells Fargo Bank, a financial institution as that term is defined at 18 U.S.C. § 20. AREHART described himself in the Business Account Application as the "Key Executive with Control of the Entity," and described the business as a non-profit organization for the homeless.

6. On or about May 15, 2018, the Internal Revenue Service ("IRS") issued a tax-exempt determination letter classifying PHVA as a "public charity" that is "required to file Form 990/990-EZ/990-N" annually – that is, granting PHVA tax-exempt status as a charitable organization pursuant to Section 501(c)(3) of the Internal Revenue Code. The IRS letter was addressed to PHVA's office location in Fredericksburg.

7. On or about May 23, 2018, AREHART registered PHVA as a charitable organization with the South Carolina Secretary of State, stating that the purpose of the organization was to "provide food, shelter, and above all HOPE for those less fortunate."

8. Beginning in or around May of 2018, AREHART created several public-facing, internet-based platforms that AREHART and his associates would subsequently use to communicate information about AREHART's fledgling charity. A PHVA website (providinghopeva.com) was registered on or about May 5, 2018, and AREHART used his personal Facebook account to create a Facebook account for "Providing Hope VA" on or around June 6, 2018 ("the PHVA Facebook Page"). AREHART would subsequently use the PHVA Facebook Page to advertise, promote, and conduct Providing Hope VA's raffle ticket sales, as well as to communicate with potential and actual raffle ticket purchasers.

9. AREHART, aided and abetted by others, also registered an email domain name (@ProvidingHopeVA.com) for the charity, and thereafter utilized multiple email addresses under that domain – to include James@ProvidingHopeVA.com and Info@ProvidingHopeVA.com – to correspond with members of the public on PHVA's behalf.

10. AREHART described PHVA's mission (via the charity's website and the PVHA Facebook Page) as the following:

> "Our vision is to build The Providing Hope Center (or PHVA Center) where homeless veterans can find shelter, food, counseling and job skills training."

The PHVA website further informed viewers that:

> "We raise funds that are primarily earmarked for our building fund – The Providing Hope Center. All other funds are budgeted to support veterans in financial difficulty, help other veteran focused organizations, and fundraising (prizes, marketing, etc.)."

11. PHVA's primary fundraising method consisted of advertising and selling raffle tickets for high-end automobiles and cash prizes, typically through the use of advertisements on the PHVA Facebook Page and the PHVA website. AREHART solicited raffle ticket purchases with the claim that the raffle proceeds (other than necessary advertising and operating expenses) would go to benefit in-need veterans of the United States Armed Forces.

12.     Individuals who decided to purchase raffle tickets from PHVA would do so by selecting a payment link on the PHVA Facebook Page. Those online purchases would then be processed by a payment processing company (to include PayPal, Square, and Stripe), with the funds eventually deposited into the PHVA Bank Account. AREHART typically conducted the raffles himself, doing so in live video feeds streamed to the public on the PHVA Facebook Page.

13.     Over the course of PHVA's activities, between November of 2018, through at least August of 2021, individuals in all 50 states and commonwealths purchased raffle tickets from PHVA through the PHVA Facebook Page. Between November of 2018 and August of 2021, PHVA's charitable raffles generated more than $9,000,000 in proceeds, the entirety of which flowed into the PHVA Bank Account.

### The Scheme and Artifice

14.     From in or around April 2018, through in or around at least December of 2021, within the Eastern District of Virginia and elsewhere, JAMES W. AREHART, the defendant, devised and intended to devise a scheme and artifice to defraud individuals, and to obtain money and property from the same, by means of materially false and fraudulent pretenses, representations, and promises concerning numerous aspects of PHVA's operations.

#### A. *Misrepresentations Regarding AREHART's Compensation*

15.     It was part of the scheme to defraud that AREHART, when advertising upcoming raffles, corresponding with potential and current raffle ticket purchasers, and responding to queries from members of the general public, made repeated misrepresentations about the nature of and basis for the financial compensation that AREHART was drawing from the PHVA Bank Account.

16.     For the first year of PHVA's existence, spanning at least May of 2018 until in or around June of 2019, AREHART consistently represented in his public postings that he was not

4

drawing financial compensation from the charity, and was instead—like all the charity's staff—a "volunteer." AREHART made these claims to both induce further raffle ticket sales and quell criticism of his fledgling charity. AREHART typically issued these representations on the PHVA Facebook page, often in the context of directly refuting allegations by other Facebook posters that AREHART was using the charity's raffle ticket proceeds to enrich himself, or that AREHART was dissipating the charity's proceeds in unseemly or outright fraudulent fashion.

17. Those representations included the following statements, issued by AREHART on the PHVA Facebook page:

| Date (on or about) | Statement |
|---|---|
| Sept. 26, 2018 | "Outside of expenses for our travel to events and advertising, all remaining proceeds are passed on to support our veterans. We're trying to open a 31,000 ft facility in Northern Virginia currently to support upwards of 100 veterans at a time. All current staff is volunteers and the CEO isn't accepting compensation until the center is fulfilled." |
| May 22, 2019 | "I took my own $125k to buy the first car, build the website, found the organization and get things rolling. I haven't taken a salary the first 14 months but that's about to change as I'm transitioning from my full time job to run this 80 hrs full time." |
| June 10, 2019 | "... Our organization has been 100% volunteer up to this point, I have already put in my notice to leave my full time job to run the organization and will then take a salary. There's been nothing to hide, just the way people approach us, and the negative comments without research and merit make it difficult to welcome with open arms. Please let me know if there's anything else you would like to know." |

18. In truth and fact, however, AREHART had begun withdrawing funds from the PHVA Bank Account (for reimbursement and his salary) beginning in at least December of 2018.

19. AREHART did not announce that he would be paying himself a salary from the PHVA Bank Account until in or around July of 2019. AREHART did not acknowledge at that point (or any time afterwards) that AREHART had in fact already been paying himself with funds from the PHVA Bank Account, to include drafting a series of payroll checks to himself (covering the first four months of the calendar year) months before his July 2019 announcement.

20. It was further part of the scheme and artifice to defraud that AREHART misrepresented the purported justification for his decision to begin paying himself a salary with charity funds. AREHART explained to the public that he would only begin drawing a salary from PHVA when the charity became AREHART's sole employment—that is, only at the point that AREHART left his previous job "for good."

21. In announcing in late May of 2019 that he had decided to begin paying himself a PHVA salary, AREHART represented that he would soon be resigning from his current employer. At that point, AREHART claimed, he would commence working for PHVA "80 hours [a week] full-time," and so would begin paying himself a PHVA salary.

   a. AREHART indicated that the timing of his departure from his current employment was imminent in a PHVA Facebook posting on May 22, 2019: "I haven't taken a salary the first 14 months but that's about to change as I'm transitioning from my full-time job to run this 80 hours full-time."

   b. AREHART subsequently announced his resignation from his previous job in a video posted to the PHVA Facebook Page on June 8, 2019.

22. In truth and fact, however, AREHART had not left his government contractor employer. Instead, AREHART continued to work for that employer for approximately seven more months, submitting his resignation to that employer only on January 3, 2020. Between June of

6

2019 and January of 2020, AREHART continued to receive regular, bi-weekly salary payments from his (purportedly former) employer.

23. It was further part of the scheme and artifice to defraud that AREHART, after announcing that he had decided to start paying himself a salary from PHVA, misrepresented the purported justification for the *amount* of that forthcoming salary. Specifically, AREHART claimed in public postings on the PHVA Facebook page that AREHART "just want[ed] to maintain my current living," and therefore he would pay himself a PHVA salary that was limited to the same amount he had earned at his previous employment. AREHART's public statements to this effect included the following public postings:

| Date (on or about) | Statement |
|---|---|
| **May 23, 2019** | "I wouldn't take a salary if I could stay at my current job and still support the organizations growth. Unfortunately the time it takes to properly grow this organization won't allow for another paying job. I'm not one of those ass hats that thinks it takes 500,000-1,000,000, plus frequent bonuses, plus all paid expenses. I just want to maintain my current living." |
| **May 23, 2019** | "Of course when I do take a salary it will be around $150,000 considering I would be leaving my current $150,000 job for good." |
| **July 22, 2019** | "I didn't take a salary the first 10 months and the organization was up and supporting itself. I now take a salary just over 100k which in Northern Virginia is below median and less than what I made working for the government." |

24. In truth and fact, however, AREHART knowingly misrepresented the amount of his previous salary in order to provide ostensible justification for paying himself a significantly higher salary from his charity's bank account.

7

25. At the time that he incorporated PHVA, AREHART was employed by a government contractor. AREHART maintained that employment through January of 2020. During his tenure at this employer, AREHART received a salary of approximately $26,000 in 2017; approximately $97,000 in 2018; and approximately $73,000 in 2019.

26. AREHART ultimately paid himself a total of $162,000 in salary and discretionary "bonus" payments from the PVHA Bank Account for the 2019 calendar year. Contrary to AREHART's representations to the public that AREHART's PHVA salary would be consistent with his "current living," or even "less than what [AREHART] made" at his previous job, AREHART's PHVA salary for 2019 constituted an approximate 67% raise from his previous employment's salary.

27. AREHART would later pay himself approximately $292,000 in salary and discretionary bonuses in 2020. For the 2021 calendar year, AREHART explained to his accountant in December of 2020, he (AREHART) anticipated paying himself a total of $320,000 in salary and discretionary bonuses. In December of 2021, AREHART proposed and approved a compensation package for himself that included a base salary of $425,000 and four quarterly "bonus" payments of $25,000 each—a total compensation package of at least $525,000.

### B. *Misrepresentations Regarding Raffle Ticket Sales*

28. It was further part of the scheme and artifice to defraud that AREHART misrepresented to potential and current raffle ticket purchasers that tickets purchased from PHVA for raffle entries were "tax-deductible." In truth and fact, however, AREHART knew that these statements were false because the Internal Revenue Code does not permit tax deduction claims for purchases of games-of-chance tickets (bingos, raffles, etc.), whether from profit or non-profit organizations. AREHART deliberately circumvented this IRS prohibition, however, by

structuring the receipts that PHVA provided to raffle ticket purchasers so that the receipt concealed the true nature of the financial transaction in question. That is, the PHVA receipts characterized the PHVA patron's purchase of a raffle ticket instead as a charitable "donation," omitting any reference to raffles or the ticket purchaser's raffle ticket number.

29. AREHART advertised these knowingly false statements to induce the public to purchase (purportedly tax-deductible) raffle tickets from his organization. In doing so, AREHART both deliberately misled potential raffle ticket purchasers and simultaneously facilitated the submission of fraudulent, purportedly tax-deductible "donation" receipts (by witting or unwitting PHVA raffle ticket purchasers) to the Internal Revenue Service.

30. AREHART frequently reassured PHVA raffle ticket purchasers that (contrary to the clear "charitable donation" language on the ticket purchaser's receipt) the purchasers had not simply made a "donation" to PHVA, but had instead successfully purchased entries in the upcoming PHVA raffle. AREHART's misrepresentations regarding this aspect of his scheme and artifice to defraud included the following PHVA Facebook page postings:

| Date (on or about) | Statement |
|---|---|
| **March 2, 2019** | PHVA Ticket Purchaser: "I purchased three tickets for $50 and [the receipt] just says 'Thanks for your generous donation of $50!' I don't know if I'm in the raffle with three chances or if they just took my money. I have a hard time with the latter if that's the case." <br><br> AREHART: "The receipt is built that way for tax purposes . . . the IRS is strict on deductions so we tailor our receipts for your benefit." |
| **March 20, 2019** | ". . . Each entry will have your name and purchase number that references your email! I explained that the IRS will not consider raffle purchases tax deductible so your receipt reflects thank you for your charitable donation." |

9

| | |
|---|---|
| **April 19, 2019** | "The receipt you received through email is for tax purposes only. It doesn't reference raffle tickets because the IRS is strict about what it allows for deductions." |
| **May 26, 2019** | Potential PHVA Raffle Ticket Purchaser 1: "Is this raffle also tax deductible as well?"<br><br>Potential PHVA Raffle Ticket Purchaser 2 (*responding to the above post*): "Curious as well."<br><br>AREHART: "Yes, when we accept the contribution, we give you a receipt for the actual contributions. The entry into the raffle isn't part of the receipt for this reason. If you've participated in the past, you will understand from seeing our receipts before." |

### C. *Misrepresentations Regarding the Allocation of Raffle Proceeds*

31. It was further part of the scheme and artifice to defraud that AREHART misrepresented how he would use the charity's raffle ticket proceeds. In public postings on PHVA's Facebook Page and website, and in correspondence with and promotional materials provided to potential and previous raffle ticket purchasers, AREHART advertised that PHVA's "direct mission" was raising funds to build "The Providing Hope Center," which AREHART described as a "31,000 [square foot] facility in Northern Virginia" capable of housing "upwards of 100 veterans at a time." To that end, AREHART repeatedly assured the public that a significant portion – "roughly half" – of all the proceeds generated by the charity's raffle ticket sales were "allocated for our direct mission," and accordingly segregated in a separate, steadily increasing "Building Fund."

32. In truth and fact, however, there was no "Building Fund." Instead, AREHART directed that all raffle ticket proceeds be deposited into a single bank account (the PHVA Bank Account). AREHART thereafter utilized those charitable proceeds as he saw fit: paying

AREHART's salary and discretionary bonuses; paying Facebook advertising costs; purchasing the raffle prize vehicles; reimbursing AREHART for various and sundry travel expenses; etc. The balance in the PHVA Bank Account, accordingly, increased and decreased according to PHVA's raffle ticket sales and AREHART's expenditures. At no point during the timeframe of this Indictment, contrary to AREHART's representations, had AREHART established a separate account for the purported "Building Fund," or otherwise segregated a portion of the charity's raffle ticket proceeds for the purchase and/or construction of "The Providing Hope Center."

33. The only building purchased by PHVA during the course of the time frame described above consisted of AREHART's purchase in or around March of 2020 (for approximately $350,000) of a 4,000 square foot office facility in Loris, South Carolina.

### D. *Misappropriation of PHVA Charitable Proceeds*

34. It was further part of the scheme and artifice to defraud that AREHART misappropriated PHVA raffle ticket proceeds to pay for AREHART's personal expenses, and that AREHART subsequently and knowingly mischaracterized those transactions in PHVA's accounting records and publicly-available tax filings in order to present a misleading portrait of the charity's financial decision-making.

35. As the sole signatory on the PHVA Bank Account, AREHART regularly utilized funds in the PHVA Bank Account to pay AREHART's credit card bills. AREHART assured his accountant, however – and later, federal agents – that AREHART only used PHVA funds to pay for credit card expenditures incurred on legitimate, PHVA-serving transactions (or for legitimately reimbursable expenses, such as AREHART's hotel and meals costs while traveling on PHVA business). AREHART claimed that he was careful to segregate his credit card usage – that is, that

AREHART used personal credit cards for personal expenses, and PHVA credit cards only for legitimate PHVA business.

36. In truth and fact, however, AREHART utilized his access to the PHVA Bank Account to pay for numerous personal expenditures that AREHART had incurred using either (the purportedly) PHVA-business-only credit cards or through the issuance of checks drawn on the PHVA Bank Account. AREHART later approved the mis-categorization of those personal expenditures in PHVA's accounting records, so that AREHART's personal expenditures were instead categorized as instances of "Direct Relief" provided by the charity to homeless or otherwise in-need veterans. AREHART also approved the mis-categorization of salary payments to PHVA staffers so that those payments were instead described as additional instances of financial "Direct Relief" provided by PHVA to in-need veterans.

37. AREHART's use of the PHVA Bank Account to pay for personal expenditures (and his subsequent mischaracterizations of those transactions), and AREHART's mischaracterization of payments to PHVA contractors, included (but were not limited to) the following:

| Date(s) (on or about) | Transaction(s) | Amount | Accounting Categorization |
|---|---|---|---|
| 1/18/2019 | Billing from the Hartwood Animal Hospital (for the care and treatment of AREHART's pet) | $390.15 | "Direct Relief – Other" |
| 5/19/2019 | Billing from the Virginia Veterinary Center (for the care and treatment of AREHART's pet) | $3,548 | "Direct Relief – Other" |
| 5/24/2019 | Billing from the Hartwood Animal Hospital (for the care and treatment of AREHART's pet) | $292.95 | "Direct Relief – Other" |

12

| 3/04/2019 – 12/26/2019 | Multiple payments to a PHVA contractor for services performed on behalf of PHVA | $18,606 | "Direct Relief – Other" |

38. AREHART understood that the mischaracterization of these personal expenditures and salary payments as being instances of financial "direct relief" provided by the charity to destitute veterans had the effect of both falsely *inflating* the amount of PHVA raffle proceeds that appeared to be allocated to the direct assistance of homeless or otherwise disadvantaged veterans; and simultaneously *decreasing* the amount of raffle proceeds that PHVA represented were being allocated to pay the salaries or compensation of PHVA employees.

39. AREHART also understood that these PHVA accounting records would form the basis for PHVA's required, publicly-available annual tax filing with the IRS—that is, the IRS Form 990. The IRS Form 990 is of especial importance to both the IRS (which describes the Form 990 as the IRS's "primary tool for gathering information about tax-exempt organizations") and those members of the public interested in assessing the financial decision-making and financial priorities exercised by tax-exempt charitable organizations.

40. AREHART subsequently approved the filing of PHVA's 2019 Form 990 with the IRS on or about July 20, 2020. That filing, which detailed PHVA's financial activity throughout the 2019 calendar year, incorporated the financial mis-categorizations described above.

41. AREHART posted a filed copy of the 2019 Form 990 on the PHVA website. AREHART subsequently and frequently urged members of the public to view the PHVA Form 990, pointing to the representations on that filed tax form as evidence of PHVA's responsible stewardship of its charity raffle proceeds.

42. AREHART understood and intended, when he directed members of the public to view the PHVA 2019 Form 990, that the mis-categorization of AREHART's personal expenditures and his payments to PHVA staff (among other transactions) as instances of "direct [charitable] relief" to veterans had the effect of producing an inaccurate summary of how PHVA was in fact allocating the proceeds generated by the charity's raffle ticket sales.

43. AREHART also used funds drawn from the PHVA Bank Account to purchase a residence titled in AREHART's name, and to subsequently make extensive improvements on that residence. Specifically, AREHART purchased a residence in Myrtle Beach, South Carolina on or about September 23, 2019. AREHART wrote a $2,000 check from the PHVA Bank Account to pay for the "earnest money" deposit on the residence, although AREHART titled the residence in his name.

44. AREHART began "leasing" this residence (while residing in the home) to his charity in December of 2019, paying himself (as landlord) $4,000 a month from the PHVA Bank Account. AREHART also withdrew $4,000 from the PHVA Bank Account to serve as the charity's "security deposit" on PHVA's lease of AREHART's residence. The purported justification for the PHVA lease was that Arehart's residence would at some point be used in the course of one of PHVA's advertised programs—"Vacations for Heroes"—which offered active duty servicemembers the opportunity to stay at the residence for week-long periods.

45. AREHART subsequently made extensive improvements to the residence, to include the installation of a pool, patio, and garage (and renovations to the residence's bathrooms, ceilings, and walls). Characterizing these improvements to the residence as "leaseholder improvements" made by the lessee (that is, PHVA), AREHART used funds from the PHVA Bank Account to fund these home improvement projects. Between January and December of 2020,

AREHART withdrew more than $360,000 in charity funds to complete the aforementioned improvements. AREHART resided at the residence until in or about November of 2020.

46. AREHART utilized the residence to host the "Vacations for Heroes" program from approximately November of 2020 through April of 2021. AREHART subsequently terminated the lease to PHVA and returned to using the house (which had at all times remained titled in AREHART's name) as AREHART's full-time personal residence through at least October of 2021. AREHART did not reimburse his charity for the $360,000 in charity funds that AREHART spent on improvements to the residence at any point prior to learning that his financial management of PHVA was under federal criminal investigation.

\* \* \* \*

## COUNTS ONE AND TWO
(Mail Fraud)

47. The allegations contained in paragraphs 1 through 46 of the Introductory Allegations and Scheme and Artifice are realleged and incorporated as though set forth in full here.

48. Beginning in or around April 2018, and continuing through in or around at least December 2021, in the Eastern District of Virginia and elsewhere, for the purposes of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, the defendant, JAMES W. AREHART, aided and abetted by others, knowingly caused to be delivered by mail, or by any private or commercial interstate carrier, according to the direction thereon, the following matters:

| Count | Date of Mailing (on or about) | Description of Mailing |
|---|---|---|
| 1 | Feb. 15, 2019 | A mailing containing a money order intended for the purchase of seven raffle tickets, addressed to "Providing Hope VA" at the designated mailing address of *160 Queen Laurens Court, Fredericksburg, VA*, mailed by a resident of New York State, who placed that mailing into a depository for United States Mail on or about February 15, 2019, in the State of New York. |
| 2 | March 15, 2019 | A mailing containing a payment intended for the purchase of raffle tickets, addressed to "Providing Hope VA" at the designated mailing address of *160 Queen Laurens Court, Fredericksburg, VA*, mailed at the direction of a resident of Connecticut from that ticket purchaser's Fidelity Investments account. |

(In violation of Title 18, United States Code, Sections 1341 and 2.)

## COUNTS THREE AND FOUR
(Wire Fraud)

49. The allegations contained in paragraphs 1 through 46 of the Introductory Allegations and Scheme and Artifice are realleged and incorporated as though set forth in full here.

50. Beginning in or around April of 2018, and continuing through in or around at least December 2021, in the Eastern District of Virginia and within the jurisdiction of this Court, as well as elsewhere, for the purposes of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, the defendant, JAMES W. AREHART, aided and abetted by others, caused to be sent and delivered in interstate and foreign commerce via wire communication the signs, signals, and writings set forth below.

| Count | Date (on or about) | Interstate Wire Communication |
|---|---|---|
| 3 | 6/08/2019 | Presentation of a live-streamed video on and through the PHVA Facebook page by AREHART, streamed from PHVA's office location in Fredericksburg, Virginia through Facebook servers located outside of the Commonwealth of Virginia. |
| 4 | 6/10/2019 | A post by AREHART on the PHVA Facebook page, posted by AREHART from in or around Fredericksburg, Virginia, within the Eastern District of Virginia, transmitted through the use of Facebook servers located outside of the Commonwealth of Virginia. |

(In violation of Title 18, United States Code, Sections 1343 and 2.)

## COUNTS FIVE AND SIX
(Monetary Transaction with Property Derived from Specified Unlawful Activity)

51. The allegations contained in paragraphs 1 through 46 of the Introductory Allegations and Scheme and Artifice, and paragraphs 47 through 50, are realleged and incorporated as though set forth in full here.

52. On or about each of the dates set forth below, in the Eastern District of Virginia, and within the jurisdiction of this Court, as well as elsewhere, the defendant, JAMES W. AREHART, unlawfully and knowingly engaged and attempted to engage in monetary transactions (as that term is defined in Title 18, United States Code, Section 1957(f)(1)) in criminally derived property of a value greater than $10,000.00, such funds having been derived from a specified unlawful activity (that is, Mail Fraud, in violation of Title 18, United States Code, Section 1341, and Wire Fraud, in violation of Title 18, United States Code, Section 1343):

| Count | Date (on or about) | Transaction |
|---|---|---|
| 5 | 4/13/2020 | A check drawn on the PHVA Bank Account (Wells Fargo account ending in -0376) in the Eastern District of Virginia, in the amount of $25,000 and payable to a South Carolina pool construction company, resulting in the withdrawal of those funds from the PHVA Bank Account and the deposit of those funds into an account maintained at South State Bank by that South Carolina company. |
| 6 | 1/14/2021 | A cashier's check drawn on the PHVA Bank Account (Wells Fargo account ending in -0376) in the Eastern District of Virginia, in the amount of $125,000 and payable to a third party, resulting in the withdrawal of those funds from the PHVA Bank Account and the subsequent deposit of those funds into a bank account belonging to a third party and maintained at a different financial institution. |

(In violation of Title 18, United States Code, Section 1957.)

## COUNT SEVEN
(False Statements)

On or about August 31, 2021, in the Eastern District of Virginia and the District of South Carolina, within the jurisdiction of this Court, the defendant, JAMES W. AREHART, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations to a Special Agent of the Federal Bureau of Investigation (FBI) and a Postal Inspector of the Postal Inspection Service (UPSIS), in relation to a matter within the jurisdiction of the Department of Justice and the United States Postal Service, both executive branch agencies of the United States. Specifically, AREHART: (1) falsely claimed that he had stopped working at his previous employment at Marine Corps Base (MCB) Quantico in May of 2019; (2) falsely claimed that he had earned $140,000 a year at this previous employment; and (3) falsely claimed that he had not begun paying himself a salary from PHVA until approximately May or June of 2019, and that he had begun paying himself a salary at this time because he had left his previous employment.

Those statements and representations by defendant AREHART were false, because as defendant AREHART then and there well knew: (1) he had not in fact resigned from his previous employment at MCB Quantico until January of 2020; (2) he had never earned more than $97,000 in any given year during this previous employment; and (3) he had written himself salary checks from the PHVA Bank Account for the months of January, February, March on or about April 19, 2019, and on or about April 30, 2019, wrote a fourth salary check to himself for the month of April 2019; and he had not left his previous employment prior to beginning to pay himself a salary from PHVA.

(In violation of Title 18, United States Code, Section 1001.)

## **FORFEITURE**

Pursuant to 32.2 of the Federal Rules of Criminal Procedure, as to Counts One through Four of this Indictment, the defendant, upon conviction of any of the offenses, shall forfeit to the United States any property, real or personal, which constitutes or is derived from, proceeds traceable to the violation.

The defendant is further notified that, upon conviction of any of the offenses listed in Counts Five and/or Six, he shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property.

If any property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(All in accordance with Title 18, United States Code, Sections 982(a)(1), 981(a)(1)(C), as incorporated by Title 28 United States Code, Section 2461(c), and Title 21 United States Code, Section 853(p).)

A TRUE BILL:

_____
FOREPERSON

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____
Thomas A. Garnett
Kashan K. Pathan
Assistant United States Attorneys